COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| IN THE INTEREST OF: | § | No. 08-24-00038-CV |
| S.R.S.,[1] | § | Appeal from the |
| A Child. | § | 65th Judicial District Court |
| | § | of El Paso County, Texas |
| | § | (TC# 2023DCM0852) |

## MEMORANDUM OPINION

Appellant P.R., mother of S.R.S., appeals the trial court's judgment terminating her parental rights to eleven-year-old S.R.S. and appointing S.R.S.'s father, R.S., as the child's permanent managing conservator. We affirm.

## FACTUAL BACKGROUND

S.R.S. and his four younger half-siblings were removed from their home by the Texas Department of Family and Protective Services (DFPS) in April 2022. The removal was based primarily on allegations of neglectful supervision and domestic violence. The DFPS caseworker who initially investigated the circumstances that precipitated S.R.'s removal did not testify at trial. However, Estela Zamarripa, the current caseworker, testified that P.R. had acknowledged that her former partner, J.R., committed domestic violence against her, that he would "always abuse her," including when her children were present. P.R.'s psychological evaluation, which the Department

---

[1] We use the parties' initials to protect their privacy. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

admitted into evidence at trial, noted that P.R. became involved with CPS because of allegations of domestic violence in the presence of her children, that her children were living in a hotel, and the children had school absences, poor hygiene, and their academic progress was declining.[2] The family service plans prepared by DFPS provide further details, including P.R.'s reports of "a history of domestic violence between herself and J.R. throughout their relationship," that there had been "a history of domestic violence in the household for the past 9 years," that P.R. and J.R. "engaged in regular and/or severe physical violence, including physically assaultive behaviors towards each other," and that P.R. "has [two] herniated discs in her back due to violence suffered at the hands of [J.R.]."[3]

Zamarripa further testified that P.R. admitted to having used cocaine and methamphetamine, and to having used the latter drug around the children. P.R.'s psychological evaluation also noted that she admitted to using methamphetamine in February 2022. P.R. also missed a random drug test in May 2023, and tested positive on other occasions, though she denied

---

[2] Because P.R. did not object to the admission into evidence of the psychological evaluation, the trial court could have considered its contents, including any unobjected to hearsay. *See In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *12 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.) (Hearsay objection to parent's psychological evaluation is waivable in parental termination suit); *In re M.W.*, No. 13-19-00593-CV, 2020 WL 1887769, at *1, n.3 (Tex. App.—Corpus Christi–Edinburg Apr. 16, 2020, no pet.) (mem. op.) (same).

[3] While P.R. objected to hearsay in the family service plans, the objection was overruled and P.R. does not challenge that ruling on appeal. Because the objection has thus been waived, *see Scudday v. King*, No. 04-20-00562-CV, 2022 WL 2230730, at *2 (Tex. App.—San Antonio June 22, 2022, pet. denied) (mem. op.) (holding any error in overruling evidentiary objections was waived where appellant, in his brief, did not explain how purported error probably caused rendition of improper judgment), the contents of the service plans, including hearsay, could have been considered by the trial court. *See In re R.H.W. III*, 542 S.W.3d 724, 734 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("Unobjected-to hearsay is, as a matter of law, probative evidence."). *See also in re L.D.*, No. 01-17-00471-CV, 2017 WL 6374663, at *4, n.2 (Tex. App.—Houston [1st Dist.] Dec. 14, 2017, pet. denied) (mem. op.) (holding that because no objection was made, "even to the extent the [family service] plans contain hearsay, the factfinder could have relied upon them [in termination of parental rights case]"); *In re Z.L.A.*, No. 04-18-00432-CV, 2018 WL 6182839, at *2 (Tex. App.—San Antonio Nov. 28, 2018, no pet.) (mem. op.) (Considering unobjected-to evidence of physical neglect and domestic violence contained in family service plan prepared by DFPS). *See also In re R.R.*, No. 01-10-01069-CV, 2011 WL 5026229, at *4 (Tex. App.—Houston [1st Dist.] Oct. 20, 2011, pet. denied) (mem. op.) (holding family service plan prepared by DFPS was admissible as "a statement and compilation of data required to be filed with the court").

she had used drugs on those occasions.[4] The family service plans note that P.R. and J.R. both admitted to "consuming alcohol on a daily basis in excess."

When Zamarripa was assigned to the case in July 2022, P.R. was incarcerated, serving a sentence for a federal conspiracy-to-transport-aliens offense that occurred in February 2022. P.R. was released in April 2023. P.R. had also been charged with an assault-causing-bodily-injury offense involving her children's aunt that occurred in January 2022, for which she received two years of probation. P.R. was re-incarcerated in September 2023 (the record does not indicate why) and remained confined through February 2024, when her rights were terminated.

Finally, the family service plans note that P.R. stated the family was evicted in October 2021 and they did not have a stable living environment thereafter.

## PROCEDURAL BACKGROUND

On April 29, 2022, DFPS filed this suit to terminate parental rights and on the same day was appointed temporary managing conservator of S.R.S. and his four younger siblings, who have a different father. DFPS's original petition alleged that P.R. was the mother of all five children, it sought to terminate her rights to the children under Tex. Fam. Code Ann. §§ 161.001(b)(1)(D) (endangering environment) and (E) (endangering conduct), and it alleged that S.R.S.'s father was "unknown." DFPS subsequently filed three amended petitions, the first identifying R.S. as S.R.S.'s "alleged father," the second identifying R.S. as S.R.S.'s "father" and alleging that his location was

---

[4] P.R. initially objected that Zamarripa's testimony regarding the results of her drug tests was not admissible, but subsequently waived the objection by not re-urging it when Zamarripa testified about the results later in her testimony. *See Tex. Tech Univ. Health Sciences Ctr.—El Paso v. Niehay*, 641 S.W.3d 761, 790 (Tex. App.—El Paso 2022), *rev'd on other grounds*, 671 S.W.3d 929 (Tex. 2023) ("[F]or trial purposes, a legion of cases hold that a party forfeits the right to object to testimony if an objection is not raised each time the offending question is asked."). *See also in re Commitment of Massingill*, No. 09-15-00365-CV, 2016 WL 2594720, at *4 (Tex. App.—Beaumont May 5, 2016, pet. denied) (mem. op.) ("To preserve error for appellate review, the complaining party must timely and specifically object to the evidence each time it is offered or obtain a running objection.") (citing *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 235–36 (Tex. 2007)); *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984) ("The general rule is that error in the admission of testimony is deemed harmless if the objecting party subsequently permits the same or similar evidence to be introduced without objection.").

unknown, and the third seeking to terminate P.R.'s rights on additional grounds—Tex. Fam. Code Ann.§§ 161.001(b)(1)(N) (constructive abandonment), (O) (failure to comply with court order), and (P) (use of controlled substance)—and alleging that R.S. had been personally served.

In addition to these amendments, on February 10, 2023, DFPS moved to sever all claims involving S.R.S. into a separate case, stating that it planned to place S.R.S. with R.S. on a monitored-return basis. The motion was granted.[5] On February 16, 2024, after a bench trial, the trial court entered a final order terminating P.R.'s parental rights to S.R.S. and appointing R.S. as the child's permanent managing conservator. P.R.'s parental rights were terminated based on findings that: (1) clear and convincing evidence showed such a result was in S.R.S.'s best interest; and (2) clear and convincing evidence showed P.R. had exposed S.R.S. to an environment that endangered him, engaged in conduct that endangered him, constructively abandoned him, failed to comply with a court order establishing actions necessary to obtain his return, and used a controlled substance in a manner that endangered him. These findings were made in accordance with Tex. Fam. Code Ann. §§ 161.001(b)(2) and (b)(1)(D), (E), (N), (O), and (P). This appeal followed.

## APPLICABLE LAW AND STANDARD OF REVIEW

### A. Termination of parental rights

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *In re A.C.*, 560 S.W.3d 624, 629–30 (Tex. 2018) (citing *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982)). *See also Santosky* at

___

[5] Prior to the monitored placement, R.S. had been granted supervised visitation with S.R.S. and ordered to participate in a DFPS family services plan. S.R.S. remained in the monitored placement with R.S. until DFPS removed him after an alleged incident of domestic violence, which was reported to the trial court. The record does not indicate whether a hearing was held on this issue, but the trial court ordered S.R.S. to be returned to R.S.'s home, where he remained through the conclusion of the case.

759 ("When the State initiates a parental rights termination proceeding, it seeks not merely to infringe [a] fundamental liberty interest, but to end it"; "If the State prevails, it will have worked a unique kind of deprivation . . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.") (quotation marks omitted). However, a parent's rights and interests are not absolute, and "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W. 3d 17, 26 ( Tex. 2002).

Texas Family Code § 161.001 "balances the convergent and divergent interests of parent and child" by permitting termination of a parent–child relationship only if (1) the parent's conduct satisfies at least one statutory ground for termination, and (2) termination is in the best interest of the child. *Id.* Further protecting a parent and child's shared "commanding" and "fundamental" interest in their relationship, each element requires clear and convincing evidence. *Id.*

Evidence is clear and convincing if it is of "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. This intermediate standard falls between the preponderance-of-the-evidence standard generally used in civil cases and the beyond-a-reasonable-doubt standard used in criminal cases. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); *In re A.B.B.*, 482 S.W.3d 135, 139 (Tex. App.—El Paso 2015, pet. dism'd w.o.j.)

A single ground under Texas Family Code § 161.001(b)(1)(A)–(V) is sufficient to uphold termination of a parent's rights. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). However, because termination of a parent's rights under paragraphs (D) and (E) may later affect the parent's rights to other children, an appellate court must always review the sufficiency of the evidence under these two grounds when they are challenged. *Id*. *See also* Tex. Fam. Code Ann. § 161.001(b)(1)(M)

5

(parental rights may be terminated if parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state").

### B. Standard of review

When the legal sufficiency of the evidence is challenged in a termination of parental rights case, reviewing courts consider all the evidence in the light most favorable to the required finding to "determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We defer to the fact-finder's conclusions, indulge every reasonable inference supporting the finding, and presume the fact-finder resolved any disputed facts in favor of the findings. *In re L.D.C.*, 622 S.W.3d 63, 69 (Tex. App.—El Paso 2020, no pet.). While we may not disregard undisputed facts, we disregard any evidence that a reasonable fact-finder could have disbelieved or found to be incredible. *Id*.

Likewise, in reviewing the trial court's findings for factual sufficiency, the reviewing court looks to whether the evidence is such that the fact-finder could reasonably form a firm belief or conviction about the truth of the allegations. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Importantly, we must not substitute our judgment for that of the fact-finder. *In re D.R.V.*, No. 08-22-00238-CV, 2023 WL 2544577, at *5 (Tex. App.—El Paso Mar. 16, 2023, no pet.) (mem. op.). We must give due consideration to evidence that the fact-finder reasonably could have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. We also "consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id*. The evidence is factually insufficient when, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction. *Id*.

6

P.R. raises six issues on appeal, arguing that DFPS failed to prove by clear and convincing evidence that: (a) P.R. knowingly placed or knowingly allowed S.R.S. to remain in conditions or surroundings which endangered his physical or emotional well-being; (b) P.R. engaged in conduct that endangered S.R.S.'s physical or emotional well-being; (c) P.R. constructively abandoned S.R.S.; (d) P.R. failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of S.R.S.; (e) P.R. used a controlled substance in a manner that endangered S.R.S.'s health or safety and failed to complete a court-ordered substance abuse treatment program; and (f) termination of P.R.'s parental rights is in the best interest of S.R.S.[6]

## DISCUSSION

### A. Paragraph (D): endangering environment

To terminate parental rights under paragraph (D), a factfinder must find that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). "Endanger" means "to expose to loss or injury; to jeopardize." *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022). While "endanger" means more than "a threat of metaphysical injury" or "possible ill effects of a less-than-ideal family environment," it does not require that there be conduct "directed at the child" or that "the child actually suffer[] injury." *Id*.

Paragraph (D) generally focuses on the child's pre-removal environment. *Id*. at 749. The suitability of living conditions and the conduct of parents and other persons in the home are both

---

[6] P.R.'s notice of appeal states that she desires to appeal from "all portions of the Order of Termination," including "conservatorship" and "rights of the parties." However, P.R.'s brief presents no issue or argument challenging R.S.'s appointment as S.R.S.'s permanent managing conservator, thus we do not consider this issue.

relevant. *Id*. Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under paragraph (D). *A.S. v. Tex. Dep't of Family & Protective Services*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.). Termination under paragraph (D) is permitted based on a single act or omission. *Id*. at 713.

More specifically, violent conduct by a parent or other resident of the child's home may support an endangering environment finding, *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.), as may a parent's decision to continue living with someone who has committed domestic violence, *In re G.M.*, 649 S.W.3d 801, 809 (Tex. App.—El Paso 2022, no pet.). Illegal drug use in the child's home may also support such a finding. *In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.). Lack of stable housing and consistent home environment can also be a factor. *In re B.N.D.*, No. 04-21-00286-CV, 2021 WL 6127883, at *4 (Tex. App.—San Antonio Dec. 29, 2021, no pet.) (mem. op.).

Here, P.R. argues that DFPS "did not call an investigator or anyone with any knowledge about why the child was removed, from whom the child was removed or whether conditions or surroundings which endangered the physical or emotional well-being of the child existed," and "[i]n fact, there is absolutely no evidence at all" regarding these matters. P.R. further contends that "[t]he only testimony of any relevance was that [P.R.] admitted to the caseworker that at some undetermined time she was the victim of domestic abuse at the hand of her husband and the children were in the house and that at some undetermined time she had used methamphetamine in the home when the children were there," and there was "no testimony about whether the drug use and domestic violence happened as isolated incidents or regular occurrences."

But while DFPS caseworker Estela Zamarripa was not assigned to the case until three

8

months after S.R.S. was removed, her testimony nonetheless addressed relevant pre-removal conditions in the home. In particular, Zamarripa testified that S.R.S. and his siblings were removed in part because of domestic violence. Zamarripa further testified that P.R. stated that her partner, J.R., would "always abuse her," which implicates regular occurrences, not isolated incidents. And beyond this testimony, the family service plans note P.R.'s statements that there was "a history of domestic violence between herself and J.R. throughout their relationship," that there was "a history of domestic violence in the household for the past 9 years," that P.R. and J.R. "engaged in regular and/or severe physical violence, including physically assaultive behaviors towards each other," and that P.R. has "[two] herniated discs in her back due to violence suffered at the hands of [J.R.]." Thus, the record reflects evidence of domestic violence that was sustained and long-standing.

Further, as to illegal drug use, Zamarripa testified that P.R. admitted to using cocaine and methamphetamine, including the latter while the children were present. P.R.'s psychological evaluation notes that she admitted to having used methamphetamine as recently as February 2022. The family service plans additionally note that P.R. admitted to "consuming alcohol on a daily basis in excess," which may not be illegal but can create an endangering environment.

Furthermore, the evidence reflects that P.R. stated the family was evicted in October 2021 and did not have a stable living environment thereafter.

While the evidence to support termination of P.R.'s parental rights under Paragraph (D)—and under Paragraph (E), discussed below—could have been developed in more detail in the trial court,[7] similar evidence has been held sufficient in other cases. *In re Z.E.C.*, for example, like this

---

[7] The bench trial in this case commenced on August 18, 2023, resumed on November 8, 2023, and concluded on February 16, 2024. The corresponding transcripts are 12, 13, and 57 pages long. The sole testifying witness was DFPS caseworker Estela Zamarripa, who was assigned to the case three months after S.R.S. was removed. Although both parents appeared with counsel, neither parent testified. Nor did other witnesses testify including the DFPS caseworker(s) who performed the pre-removal investigation and initially set up the family service plan, or the psychologist who evaluated P.R., or any other expert or fact witness. As a result, the judgment terminating P.R.'s

case, involved termination of a mother's parental rights under Paragraph (D) based on evidence of domestic violence and drug use. *In re Z.E.C.*, No. 08-23-00282-CV, 2024 WL 779616, at *6 (Tex. App.—El Paso Feb. 26, 2024, no pet.) (mem. op.). There, as to domestic violence, we noted that "[a]lthough no specific evidence of domestic violence between [the mother] and [the father] was introduced by [DFPS], [the mother] conceded that [the father] had been violent towards her and controlling during their relationship," thus "there was no dispute that her relationship with him had been abusive, yet she voluntarily left [a] rehabilitation facility to return to him while he dealt drugs." 2024 WL 779616, at *6.

Here, by comparison, beyond the non-specific evidence that J.R. "would always abuse [P.R.]," and their relationship was "abusive and intense," the record includes more specific evidence of domestic violence, namely P.R.'s statement that she "has [two] herniated discs in her back due to violence suffered at the hands of [J.R.]." And while there was evidence that the mother in *Z.E.C.* returned to her abuser repeatedly after being abused, 2024 WL 779616, at *6, here P.R. stated that despite "a history of domestic violence between herself and J.R. throughout their relationship," she stayed with him for nine years.

Further, while neither *Z.E.C.* nor this case involved evidence that the children were direct victims of domestic violence, we explained in *Z.E.C.* that "[d]omestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the child's presence, were not directed at the child, or did not cause actual injury to the child." 2024 WL 779616, at *6. *See also In re G.M.*, 649 S.W.3d at 809 (holding a parent's decision to continue living with someone who has caused instances of domestic violence may support an endangerment finding under subsection (D)); *C.H. v. Texas Dep't of Family & Protective Services*,

---

parental rights rests in significant part on the documentary record that included family service plans and P.R.'s psychological evaluation.

389 S.W.3d 534, 540 (Tex. App.—El Paso 2012, no pet.) (holding that a parent's inappropriate, abusive, or unlawful conduct may create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)).

As to drug use, both in *Z.E.C.* and here, there was evidence of illegal drug use before DFPS got involved, including use of methamphetamine, as well as missed or positive test results during the pendency of the case. 2024 WL 779616, at *5. As we explained in *Z.E.C.*, "illegal drug use may support a finding of environmental endangerment." *Id.* at *6. *See also In re A.H.*, 679 S.W.3d 817, 829 (Tex. App.—El Paso 2023, pet. denied) (mem. op.). Further, failure to submit to drug testing can be taken as an indication that a parent was avoiding testing because of illicit drug use. *See In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Additionally, a parent's continuing drug use when the custody of her child is in jeopardy can support a finding of endangerment. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Looking at the evidence in the light most favorable to the trial court's finding under paragraph (D), we conclude that the trial court could reasonably have formed a firm belief or conviction that P.R. knowingly placed S.R.S. or knowingly allowed S.R.S. to remain in conditions or surroundings which endangered him. P.R. points to no evidence contrary to this finding. Accordingly, we overrule P.R.'s first issue.

**B. Paragraph (E): endangering conduct**

To terminate parental rights under paragraph (E), a fact-finder must find that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "Endanger" has the same meaning under paragraph (E) as under (D). *In re R.A.B.*, No. 08-22-00247-CV, 2023 WL 3672050, at *5 (Tex. App.—El Paso May 25, 2023, pet.

11

denied) (mem. op.).

Paragraph (E) focuses on both acts and omissions, but more than a single act or omission must be involved; i.e., a voluntary, deliberate, and conscious course of conduct is required. *In re K.A.C.*, 594 S.W.3d 364, 372 (Tex. App.—El Paso 2019, no pet.). Relevant conduct may occur before or after the child's birth, or before or after the child's removal, and may occur outside the child's presence. *Id*. Scienter is not required for a parent's own acts. *Id*. at 372–73.

More specifically, a history of domestic violence may support an endangering conduct finding, *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.), even if the child was not always present when the violence occurred, *In re L.W.*, 609 S.W.3d 189, 200–01 (Tex. App.—Texarkana 2020, no pet.). Illegal drug use may also support such a finding, *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.), including drug use after the child has been removed from the home, *see D.H. v. TDFPS*, 652 S.W.3d 54, 62 (Tex. App.—Austin 2021, no pet.) ("[A] parent's decision to use illegal drugs while the termination suit is pending . . . may support a finding of endangering conduct . . . . because . . . ongoing drug use jeopardizes the parent-child relationship and subjects the child to a life of uncertainty and instability."). Other conduct contributing to such a finding may include being incarcerated, since "when a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child, negatively impacting the child's living environment and emotional well-being, *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.), or inconsistent visitation with the child, *In re A.F.*, No. 07-19-00435-CV, 2020 WL 2786940, at *6 (Tex. App.—Amarillo May 29, 2020, pet. denied) (mem. op.).

Here, as to her history of domestic violence, P.R. argues that there is no evidence of the nature of any such violence, where the children were when it occurred, or whether P.R. moved away from the violence or continued to live with the perpetrator. But as noted above, the evidence

12

reflected that J.R. would "always abuse [P.R.]," including in the children's presence, that there was "a history of domestic violence between [P.R.] and J.R. throughout their relationship," that there was "a history of domestic violence in the household for the past 9 years," that P.R. and J.R. "engaged in regular and/or severe physical violence, including physically assaultive behaviors towards each other," and that P.R. has "[two] herniated discs in her back due to violence suffered at the hands of [J.R.]."

Further, as to drug use, as also noted above, P.R. admitted to using cocaine and methamphetamine, including the latter while the children were present, using methamphetamine as recently as February 2022, and "consuming alcohol on a daily basis in excess." Moreover, P.R. tested positive for drugs on occasions and also missed a drug test in May 2023, from which the trial court could have inferred that P.R. was using drugs during the pendency of this case. *See In re Z.E.C.*, 2024 WL 779616, at *6 ("[F]ailure to submit to court-ordered drug tests can be taken as an indication that the parent was avoiding testing because of illicit drug use.").

In addition, the evidence reflects that P.R. was incarcerated for the majority of the time this case was pending, including two separate periods of confinement, the second of which was ongoing at the time the termination proceeding concluded. P.R. also missed half of her visits with S.R.S. while she was not incarcerated, in addition to not writing him letters regularly while confined.

As noted above, a "voluntary, deliberate, and conscious course of conduct" must be shown to satisfy the endangering conduct ground. *In re R.A.B.*, 2023 WL 3672050, at *5 (Tex. App.—El Paso May 25, 2023, pet. denied) (mem. op.). Here, relevant evidence of such a course of conduct includes P.R.'s history of domestic violence, drug use, incarceration, and inconsistent visitation with S.R.S. *See In re P.W.*, 579 S.W.3d at 727 (domestic violence is relevant to Paragraph (E)); *In re K-A.B.M.*, 551 S.W.3d at 287 (drug use is relevant to Paragraph (E)); *In re M.R.J.M.*, 280

S.W.3d at 503 (incarceration is relevant to Paragraph (E)); *In re A.F.*, 2020 WL 2786940, at *6 (inconsistent visitation is relevant to Paragraph (E)).

Looking at the evidence in the light most favorable to the trial court's finding under paragraph (E), we conclude that the trial court could reasonably have formed a firm belief or conviction that P.R. engaged in conduct or knowingly placed S.R.S. with persons who engaged in conduct which endangered his physical and emotional well-being. P.R. points to no evidence contrary to this finding. Accordingly, we overrule P.R.'s second issue.

Having concluded that the trial court's findings under paragraphs (D) and (E) are grounded in legally and factually sufficient evidence, we decline to address P.R.'s third, fourth, and fifth issues relating to paragraphs (N), (O), and (P), as they are unnecessary to the resolution of this appeal. *See* Tex. R. App. P. 47.1; *N.G.*, 577 S.W.3d at 237, n.1 ("We recognize that this holding [i.e., that due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under paragraph (D) or (E)] may mean that appellate courts will review findings under [paragraph] (D) or (E) without reviewing other grounds. Because those other grounds carry no weight for parental rights to other children . . ., due process demands no more.").

## C. Best interest

Before terminating a parent–child relationship, a trial court must find, not only that at least one statutory ground is satisfied, but also that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1)–(2). There is a strong but rebuttable presumption that it is in the child's best interest to preserve the parent-child relationship. *Z.E.C.*, 2024 WL 779616, at *7.

The child's best interest is analyzed under the *Holley* factors:

(A) the child's desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E)

14

the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (citations omitted). These factors are non-exhaustive. *In re K.M.L.*, 443 S.W.3d 101, 116 (Tex. 2014). No one factor is controlling and sometimes analysis of a single factor may be adequate. *Z.E.C.*, 2024 WL 779616, at *7. In reviewing the legal and factual sufficiency of a best-interest finding, an appellate court may consider the evidence supporting statutory grounds for termination. *In re A.H.*, 679 S.W.3d at 832.

**(1) S.R.S.'s desires**

The first *Holley* factor is "the desires of the child." *Holley*, 544 S.W.2d at 372. Here, S.R.S.—who was eleven years old at the conclusion of the trial—did not participate in the trial.[8] P.R. argues that "[t]here was absolutely no evidence that [S.R.S.] did not want further contact with his mother." P.R. further points to Zamarripa's testimony that over the several-month span during which S.R.S. had visits with his mother, he went from being happy and excited to "just like routine like reaction," but "would still want to be at the visit." On the other hand, though, CASA representative Minerva Olivares stated that after S.R.S. was temporarily moved from his father's home to his siblings' aunt's home in December 2023, Olivares had asked S.R.S. what he wanted, and he said he "missed his father" and "wanted to see his father and wanted to go back to his father."[9] Olivares added that "[i]n the brief times that I would speak with [S.R.S.,] no positive

---

[8] In a bench trial involving termination of parental rights, a child under 12 years old may be interviewed in chambers at the court's discretion. Tex. Fam. Code Ann. § 153.009. Here, there is no indication that S.R.S. was interviewed.

[9] Olivares was questioned on the record and provided information and recommendations. No objection was made to her testimony being unsworn, thus waiving the issue. *See Guardianship of A.E.*, 552 S.W.3d 873, 882, n.5 (Tex. App.—Fort Worth 2018, no pet.) (mem. op.) ("The common law has long recognized that 'testimony' in the

words would come out from him to me about his mother." Based on this evidence, the trial court could have found termination weighed in favor of a best interest finding.

### (2) Current and future physical and emotional needs and physical danger

A trial court may infer that a parent's past endangering conduct may recur in the future if a child is returned to the parent. *A.H.*, 679 S.W.3d at 832. Here, P.R. argues that "[t]he record did not show that [P.R.] did not meet [S.R.S.]'s physical or emotional needs while he was previously in her care." More specifically, P.R. contends there was no evidence she was a danger to S.R.S., acted aggressively or violently towards him, negligently supervised him, abused him, or exposed him to physical danger.

But as noted above, in regard to violence in the home, the evidence showed that J.R. would "always abuse [P.R.]," including in the presence of the children, there was "a history of domestic violence between [P.R.] and J.R. throughout their relationship," there was "a history of domestic violence in the household for the past 9 years," P.R. and J.R. "engaged in regular and/or severe physical violence, including physically assaultive behaviors towards each other," and P.R. has "[two] herniated discs in her back due to violence suffered at the hands of [J.R.]."

Further, in regard to drug use, the evidence showed that P.R. used cocaine and methamphetamine, including the latter while the children were present, used methamphetamine as recently as February 2022, and "consum[ed] alcohol on a daily basis in excess." Methamphetamine is a Penalty Group 1 narcotic, Tex. Health & Safety Code Ann. § 481.102(6), i.e., a "hard drug," unlike marijuana, for example, and carries a greater risk of danger and incarceration. *R.A.B.*, 2023

---

context of a legal proceeding is fundamentally defined as 'a statement made by a witness under oath.' Moreover, 'the administration of the oath by a competent officer is a fundamental and essential requirement to give testimony its binding force,' and the Texas Constitution 'clearly implies that such is a prerequisite to the giving of evidence.' However, any error associated with the failure to swear [an individual who testifies] as a witness is waived by the failure of any party to object.") (citations omitted); *see also id.* (quoting *Trammell v. Mount*, 68 Tex. 210, 4 S.W. 377, 379 (1887) ("The appellants allowed the witness to give his testimony without being sworn, and thereby waived any objections to it on that account.").

16

WL 3672050, at *11. P.R. also tested positive for drugs on occasions and missed a random drug test in May 2023, which can be taken as an indication she used illegal drugs during the pendency of this case. *Z.E.C.*, 2024 WL 779616, at *6.

Furthermore, the evidence showed that P.R. was incarcerated for the majority of the time this case was pending, including two separate periods of confinement, the second of which was ongoing at the time the termination proceeding was concluded. P.R. also missed half of her visits with S.R.S. while not confined, in addition to not writing him regularly while confined. *See In re J.F.-G.*, 627 S.W.3d 304, 312–13 (Tex. 2021) ("[M]ere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child, but…incarceration does support an endangerment finding if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child.") (quotation marks omitted); *In re R.A.G.*, 545 S.W.3d 645, 652 (Tex. App.—El Paso 2017, no pet.) (fact-finder may infer parent's lack of contact with child and absence from child's life endangered child's emotional well-being).

The trial court could have found that these factors all weighed in favor of its best interest finding.

### (3)   Parental abilities, stability of proposed placement

A parent's past neglect or inability to meet a child's physical or emotional needs may be considered when analyzing her parenting ability, as may the circumstances that led to the child's removal. *A.H.*, 679 S.W.3d at 833. Here, P.R. argues that "[t]here was no evidence of the condition of [the] home before the children were removed and no evidence of the care she provided to [S.R.S.]," and no evidence she "was a continuing danger to [S.R.S.], had threatened [him], or that [R.S] was unable to protect [S.R.S.] from her." However, the record did contain evidence of endangering conduct by P.R., as well as an endangering environment, as discussed above.

17

Further, a parent's failure to comply with a court-ordered service plan may also be considered. *Z.E.C.*, 2024 WL 779616, at *8. Here, it is undisputed that P.R. did not maintain contact with S.R.S. in accordance with the family service plan, did not complete parenting classes, did not submit to a substance abuse assessment, and did not fully comply with random drug testing.[10] In addition, Zamarripa repeatedly explained to P.R.—maybe ten times—that DFPS would seek to terminate her parental rights if she did not complete the services in the family service plan. P.R.'s response to Zamarripa was that "her focus was her federal probation and that if she didn't comply with that then she would be incarcerated which would then lead her to not get her kids." When Zamarripa explained that "this is a running case and if you don't complete your services in time you could lose your rights to your kids because it is a court order," again "[P.R.] would go back to, 'well, no, my federal probation is more important right now.'"

Finally, as to the stability of S.R.S.'s current placement, P.R. argues that "[t]he record contains minimal evidence of [S.R.S.]'s current placement," and "[t]here was no evidence about where [R.S.] lives, who the household members are, where [R.S.] works, where [S.R.S.] goes to school, what activities he is engaged in and whether he has any therapeutic needs." However, as P.R. herself notes, "[t]he evidence was that [S.R.S.] was placed with his father and the child is happy, thriving, making good grades and losing weight." Additional details were provided by Olivares, who stated that S.R.S. is pre-diabetic and on the autism spectrum, but that since being placed with his father, his autism has been under control and he has been seeing a specialist and nutritionist, and that the family has learned about cooking healthy and S.R.S. says he feels happier.

---

[10] P.R. does not discuss the extent to which she complied with the service plan in relation to the best-interest element, but elsewhere in her brief argues that she at least partially complied with the plan, e.g., maintained some employment while not incarcerated by selling food, fruit, and "stuff like that," submitted to some random drug testing, submitted to a psychological assessment, participated in individual therapy, and reportedly started domestic violence classes, parenting classes, substance abuse classes, and a batterer's intervention program.

Olivares also reported that R.S.'s wife gets along with S.R.S. very well, is very caring, takes him to his appointments, and told Olivares "I love [S.R.S.]. I learned to be a mother to him, and I want what's best for him." Olivares concluded that "[w]e believe that what is in the best interest of [S.R.S.] is to remain with his father and his common-law wife. They are making sure that [he] is well, stable, happy and healthy." Again, the trial court could have found that these factors all weighed in favor of its best interest finding.

In sum, looking at the evidence in the light most favorable to the trial court's finding under paragraph (b)(2), we conclude that the trial court could reasonably have formed a firm belief or conviction that termination of P.R.'s parental rights is in S.R.S.'s best interest. *See J.O.A.*, 283 S.W.3d at 344. P.R. points neither to undisputed evidence contrary to this finding such that a reasonable fact-finder could not have formed such a firm belief or conviction, *see L.D.C.*, 622 S.W.3d at 69, nor to disputed contrary evidence so significant that the trial court could not reasonably have formed a such a firm belief or conviction, *see J.F.C.*, 96 S.W.3d at 266. Accordingly, we overrule P.R.'s sixth issue.

## CONCLUSION

For the reasons stated above, we affirm the trial court's judgment.


GINA M. PALAFOX, Justice

July 19, 2024

Before Alley, C.J., Palafox, and Soto, JJ.

19